Argument 21-1439 United States v. Krivoi Mr. Langone, you have reserved two minutes for rebuttal. Your Honors, this case would not have gone to trial but for the fact that Mr. Krivoi said, I didn't kidnap anybody. This case would have pled out on the attempted extortion. There's no question I take it about the two counts of extortion? Yeah, there's no question with respect to the attempted extortion, Your Honor, because Krivoi certainly was aware that when he went to help his cousin stop this kidnap. But you're not questioning the extortion charge. Yeah, I'm not questioning that. You're only questioning the kidnapping. The kidnapping, Your Honor. I mean, what would you have us, what would, if you're right, what's the next step to send it back down for resentencing? Yes, yes, Your Honor. And, you know, and I made a mistake too. I should have added another issue because earlier in the case there was a request for a two point for acceptance of responsibility that he didn't get. And I read the commentaries and the sentencing guidelines actually speak to that. In fact, if there's a real bona fide question with respect to the application of a statute and that's the only reason why you're going to trial is because this, your belief that the application of the statute is inappropriate. And you do it in good faith and it's a close case that maybe you'd be entitled to the two points of acceptance of responsibility. We had negotiated repeatedly with the government in this case to allow us the plea. He just wouldn't take it. The government wanted to allow us a plea and give him four points for abduction. And he said, I didn't abduct anybody. You know, what's interesting is, so he meets, they go and meet. They take their own cars to meet at the Massell restaurant in Sheepshead Bay on Emmons Avenue. They bring their own vehicles. Creevoy brings his Dodge Ram. He's got his family mail on the front passenger seat. When Risen pulls up in his own truck also, work truck, and there were people eating outside, cameras. I even put a picture, inserted a photo. And Creevoy comes, when Burev, Daniel Burev comes outside, Daniel Burev now is, he's already tape recorded the phone calls. He's worked with his buddy because he knows that there's going to be an issue that he's going to have to take to the police later on. But staying on Creevoy, when Burev steps outside, he's walking to Risen's vehicle. Risen says, no, no, no, go in that car. Go in his car. And Risen had all kinds of stuff in his truck. So Daniel goes to the car and Creevoy has to take the stuff in the back seat. Daniel says- So Creevoy thought they were going to use someone else's car? Yes. Creevoy had no idea that Daniel was going in his car. But so he knew someone's car was going to be used. He knew that they were going to pick up, that they weren't going to threaten him in front of people, I presume. So they made a plan to take him to some other location. The fact of whose car it was, maybe there was not a meeting of the minds. Well, I'm not sure. You know what? Look, I don't know. There was no evidence as to a plan to take him to another location. You just said there was a plan to take him to another location. I'm assuming here because what happens, he says- Right. It's an available assumption on this evidence. On the evidence. So how long is the ride, Judge? First, Daniel gets in the car and he's not worried. He's not worried. You know, we think kidnapping, we think the Limburg baby. He's not worried. He gets in that car. He's looking at the gadgets in the car. He says, oh, I'm- He said, it happened so fast, I don't even know how. It was maybe a minute or two. He says, I was looking at the things in the car. No element of kidnapping that requires worry on behalf of the victim, is there? Yes, yes, and that's my point. There was no worry. What element of kidnapping requires worry on behalf of the victim? Well, no. Well, there has to be an awareness that you're being restrained against your will, and I would presume that that connotes a worry. I see. That's incorporated in the bundle of emotions, I would think. He had none of that. He went there knowing, he said he was knowing that he was going to have Risen arrested, and he knew he wasn't going to really be hurt because Risen treated him like a son, Judge, treated him very well. In fact, even after Daniel left, they remained friends. Risen gave him money for a car to help fix his car. So, respectfully, I think that my point is that with respect to this kidnapping statute, there needs to be guardrails on it. I'm still concerned about what's going to happen when we do whatever we do. I mean, you have this statement of reasons where, in effect, the trial judge is saying that he thinks this was overcharge, and he's sentencing him on the basis of the extortion charges. That's what he says, isn't it? Pretty much. So he's saying what you want us to do is to send it back and say, okay, do what you said you would do, sentence him on the basis of the extortion charges only. That is correct. That is exactly right. Even though he said, he's already said. Well, we know procedural reasonableness requires first the corrective. No, I understand that. I just want to know what it is we're doing. Yeah, you know, and there is a difference in having another conviction on your record. I mean, it's not a period victory. It's a kidnapping. And that's a serious matter to have on a record no matter what. And with respect to the second issue, Your Honor, so I think that there is. And so the legal guardrail you're looking for is a durational requirement. It's a durational requirement, yes. And there was also an absence of intent on the part of Mr. Crevoy. He had no idea that when he took the case. The duration was long enough to beat him up, wasn't it? You've counted the driving time, but then there's the time in the woods. So you know what? There we go. I mean, if we look at the test set forth in the Ninth Circuit in that Jackson case, they talk about the duration. Here it's like two minutes. Two minutes in the car. Why is that different? I apologize, Your Honor. Go ahead. But occurred during the commission of a separate offense. Yes, it occurs during the commission of the attempted extortion. The detention was inherent in the crime. In other words, so when you get to the park, the detention is inherent in the extortion, in the attempted extortion. I submit that when he's out of the car, it's not kidnapping at that point. They're walking with him in the field. He could have ran at any time. There are people around. There are people fishing, boating. Where does the headlock come in? Well, the headlock supposedly comes in when Bureau gets out of Crevoy's car when they're at the park. He steps out of Crevoy's car. That's when Risen supposedly comes up to him and says, hey, I want to talk to you, you know, and puts him in the headlock. That is the point, too, here. I mean, the point, too, here was that the FBI goes to the hotel that's right across the street from the parking lot and overlooks the parking lot. It's got surveillance cameras that overlook the parking lot that could have showed this incident because this case turned entirely on the credibility of Bureev. And what happens was the FBI agent goes with a card. He's a young agent. He's new to the game. Goes with a card to the manager. Manager's not there. He leaves the card at the desk and never comes back, never pursues it, never pursues finding the evidence that could have either established the veracity of Bureev circumstantially or could have repudiated or refuted his testimony. And we thought that that was really critical. And I wanted to really explore that through the fact that the family in this case had friends in the FBI. And that was we had good faith basis in the record for that. And the judge here said, listen, I said it was a Whitley v. Kyles issue. I said, we have a right to explore all the inadequacies in the investigation. And the judge says, well, no, to me, you haven't supplied a sufficient basis, good faith basis, to go into this inquiry. In other words, it was a fishing expedition where I had evidence or at least from Bureev's own words to his friends that his friends, his family's got friends in the FBI. He contacts the FBI and not state authorities to initiate this prosecution. And, you know, there was his mother was supposed they were brought here based on asylum from Russia or Ukraine. I'm not sure which. But there were issues. His mother was in the banking industry. And then sure enough, he doesn't Bureev doesn't tell anybody, but he starts a company, Dasky Capital, which is exactly the name of a company that the that was that was a that was a boiler room. It was a bus desk. So it's not clear to me what any of that has to do with the guilt or innocence of the defendant. But am I right that the judge did give the district judge gave you room to explore this with the FBI agent? I didn't construe the judge's order that way. I construed his order as off limits. You haven't made a good faith basis. Don't go into it. So, you know, unless I know unless I knew specifically that that agent had a connection, I knew something in particular about that family's relationship with the FBI. I was told that there was no good faith basis to go into the background of. Does the family know about FBI and his friends in the FBI and that kind of stuff? That's how I construed it. If I was wrong, you know, then I was wrong. But that was my understanding. Thank you, Mr. Langone. You do have two minutes reserved for rebuttal. We'll hear from the government. May it please the court. Jonathan Siegel for the United States. Your Honor, I'd just like to start with the last issue and Judge Nathan's question about what Judge Vitaliano allowed on cross. And this is in the government appendix at page 372. The government's motion was to preclude cross-examination of the victim. There was no motion to preclude, or as it's laid out in Judge Vitaliano's opinion, it was a motion to preclude cross-examination of the victim, not of the FBI agent. And then Judge Vitaliano's ruling is clear. And I'm just going to read from it. If Cravoy's contention is that a specific law enforcement officer is biased based on his or her relationship with Doe, which is how the court referred to the victim, then that officer would be the appropriate witness to examine or cross-examine as to potential bias, not Doe. There is no way to read that that does not make clear what Judge Vitaliano was saying. It is not appropriate to cross-examine the victim on that because the victim can't speak to any alleged bias, which is the only potential relevance of this line of questioning. But an FBI agent would be the appropriate person to question of whether there was bias. Well, I take it this means not a FBI agent, but an FBI agent who was potentially, there was some evidentiary basis to conclude was biased. I understand that to be Mr. Langone's argument, not that he could explore this with any FBI agent, but with an FBI agent for which there was some basis to conclude had the connection to the victim. Well, that's right. But the relevance of any of this, the way it becomes relevant, if at all, is to say this investigation was done in a way differently than it should have been done because of this bias. The agent who led the investigation, the agent who Mr. Langone was criticizing for leaving his car instead of waiting for the manager, that FBI agent testified. So to the extent there's any argument that that FBI agent should have done things differently or would have done things differently and that can be explained because of bias, then that FBI agent was the appropriate person to cross. Judge Vitaliano's ruling allowed that, and the fact that the defense did not take advantage of it is not a basis for appeal. But to return to really the crux of the case here, Mr. Cravoy's argument, and I think Your Honor's fixed on this at the beginning, is that he should have been convicted of extortion instead of kidnapping and extortion. Yeah. Attempted extortion. Yeah, yeah, exactly. But it is well established and well recognized that a single course of conduct can violate multiple criminal laws, and kidnapping is a very good example of that. I appreciate that, but my question would be, what is there in this sequence of events that lasted 30 minutes, not two, in this 30-minute sequence of events in which the restraint on Buryev was not integral to extorting him in a secure location? Well, Your Honor, I can provide those facts, but even if it is all integral, you know, to take the Lindbergh baby, which is the paradigmatic example of kidnapping and one of the influences for the federal statute, the reason the Lindbergh baby was kidnapped was to extort Lindbergh. The point wasn't the kidnapping. It was extortion accomplished through a kidnapping, which is exactly what happened here. And now to get to those facts. There was the message from Mr. Resin that alluded to the fact that he might cripple him, that he had to come and they had to work this out. When he was at the restaurant, Mr. Resin said, if you don't come outside, I'm going to cut your throat. When he comes outside, he's directed to get into Mr. Cravoy's car, which, contrary to the way it's characterized here, and especially in the light most favorable to the government, the witness testified was a terrifying experience. He's being directed into this car with this large man that he's never met before. Well, the purpose of extortion is to terrify people. So the question is what is it that was done that constitutes a restraint or a detention that is not integral to the act of extortion? And the Lindbergh baby was murdered. I mean, it's not a close analog. Well, but, Your Honor, in any kidnapping where the point is to extortion, you can say all of this was integral to the extortion. The reason you kidnap someone is often to extort. And the reason they did this was to extort. I don't think there's any question of that. But he was put in the car. The car starts moving. He can't exactly jump out of the moving car. When the car gets to this isolated park, he's put in a headlock, which, again, contrary to the characterization here, in the light most favorable to the government, was a restraint. He was not able to leave. He's then transported from the car into a further isolated area where he is beaten and threatened, both by Mr. Resin and by Mr. Cravoy, who inflicts the beating and says, We should bury him right here. On the way back, the victim says, I want to leave. I want to walk home. And the extortion was over. The extortion phase of this was over, and he was not permitted to walk home. And he's told, You can't leave. Then he's put back in the car. The car drives again. He's now in a moving vehicle. He gets out of the car, and he's put in a headlock again. So there are several instances of restraint here. And there's transportation, all of which are hallmarks of kidnapping. But, Your Honor, even if all of that is part of the extortion, I don't think there's, even under any legal test, I don't think there's any principle of law that if you kidnap someone in order to extort them, if the reason you're kidnapping someone, if the reason you're beating them, if the reason you're doing all of this is to extort them, that it's not still a kidnapping. Even under the Ninth Circuit test, what the facts were there, it wasn't that you kidnapped someone so that you could beat them. It was someone was being beaten for several minutes. During that beating, they could not leave. You're saying this would pass the, what is it called, the Berry test? The Berry test or the Jackson test. You're saying whether or not we should apply it, even if we did apply it, the result would be the same. That's right, Your Honor. The Berry test is not the Third Circuit. It's not the Third Circuit. It's certainly not binding. And we cite authority that the Second Circuit has already questioned whether that is appropriate. It's certainly not a textual approach to the kidnapping statute. If it's always possible, we'll go en banc to reveal it. That's right. But the Second Circuit is even beyond that. It has appropriately said that if the kidnapping statute is too broad, if it should be narrowed, that's really a question for Congress, not for this Court. But you can't compare the situation in, for example, Jackson, where the only restraint was the assault. You know, that would turn literally any time anyone beats anyone, that that would turn that into a kidnapping. And the Ninth Circuit rejected that. This is different. This isn't any time someone is extorted. It's if someone is extorted by means of threatening them to get into a vehicle, driving them to an isolating place, restraining them, dragging them into a further isolating place, beating them. You're saying, aren't you, that it's not necessary for us to wonder about whether we're free to adopt the Berry test or to apply the Berry test. It really doesn't matter because whether we apply that test or what we think is the Second Circuit test comes out the same way.  All right. I'm happy to answer any further questions, but unless the Court has further questions, the government will yield its time and rest on its papers. Thank you, Mr. Siegel. Thank you. Mr. Langone, you have two minutes. Thank you, Your Honor. I would just like to say, first of all, that with respect to the incident in the park itself, so even after Daniel was struck by Mr. Krieger when he fell to the ground, when he got up, he says, I'm not paying you anything, to Risen. And then Risen says, well, you know, we can kill you. And he said, I'll cut your throat because he had a knife. And Daniel says, go for it. And nothing happened. Nothing happened because they were not going to do that. So when they're walking out of the park now, as they're leaving, Risen is saying, he's a good kid. He's telling them, he's a good kid, whatever, you know, Mutt and Jeff, whatever they're playing. And as they walk out of the park, Daniel says, I'm going to walk home. Risen says, get in the car. We'll give you a ride home. We'll give you a ride home. Now, was that still part of the extortion at that point, the attempted extortion at that point? I respectfully submit that it doesn't sound like it. They go then drive back to the mausoleum where they get out of the car, and the prosecutor here says that Risen again put them in a headlock. Well, there's testimony also that Risen, they may have been smoking marijuana. What do you say to your adversary's argument that virtually all kidnappings are for the purpose of extorting a ransom or money, and no one does it for recreation? You know, Judge, I think it's a center of gravity analysis. I mean, what is the significance of the aspect? How entrenched and a part and parcel of is the aspiratation to the overall criminal act? And when you have time and the events involving the kidnapping seem very short duration, and in addition to that, no elements of coercion or holding or any indication that he's afraid at the time he's in Creevoy's car, I submit that that is insufficient factually to comport with the spirit and intent of the kidnapping statute. This is why a lot of states and some of the federal circuits, states have merger laws with respect to kidnapping where the kidnapping is more of the aspiratation of the abduction is more of a tangential part of the whole act. And then they say, well, we say it merges. And it's really a mercy jurisdiction, a mercy function in a sense, because the kidnapping statute is so onerous and brutal in sentencing because it was intended for the Kimber baby kind of situation. So I respectfully submit to the court that the evidence was paper thin with respect to Creevoy's intent to engage in kidnapping, that, in fact, if you apply any kind of guardrails and incorporate any kind of requirements, that it's not an Ipsy Dixit with respect to kidnapping. Not anything goes to establish it. And I think that this is a case that establishes what Judge Vitaliano said is the problem. I rejected it because it was overcharged. Well, let's get into the analysis of how can we cabin this so that this kind of miscarriage of justice, in my mind, doesn't happen. Thank you so much. Thank you, counsel. Thank you to both counsel for your helpful arguments and briefing. We appreciate it. The matter is submitted.